**FILED**

JUL 2 7 2015

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

|  |  |  |
|---|---|---|
| JULIE AXNESS, | \* | |
| | \* | CIV 14-4078 |
| | \* | |
| Plaintiff, | \* | |
| | \* | MEMORANDUM OPINION AND |
| | \* | ORDER DENYING PLAINTIFF'S |
| | \* | AND DEFENDANTS' MOTIONS |
| vs. | \* | FOR SUMMARY JUDGMENT |
| | \* | |
| AQREVA LLC, CARLA CAMPBELL, in her | \* | |
| capacity as an employee of Aqreva, CHILD & | \* | |
| ADOLESCENT NEUROLOGY, and DR. | \* | |
| JORGE SANCHEZ, as owner of Child & | \* | |
| Adolescent Neurology | \* | |
| | \* | |
| Defendants. | \* | |
| | \* | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Plaintiff and Defendants each bring motions for summary judgment in this Title VII employment discrimination action. Plaintiff moves for partial summary judgment as it relates to the definition of "employer" under Title VII of the 1964 Civil Rights Act. Specifically, Plaintiff moves the Court to, as a matter of law, preclude Defendants Aqreva LLC and Carla Campbell from availing themselves of the defense that they are not Plaintiff's Title VII "employer." Defendants, in turn, each move for summary judgment in their respective favors as to the entirety of the action. For the reasons herein, each motion is denied in full.

**BACKGROUND**

The facts of this case are disputed. What is clear from the undisputed facts, however, is that Child & Adolescent Neurology ("CAN") is a clinic operated by its principal and sole practitioner, Defendant-Dr. Jorge Sanchez ("Sanchez"). In October 2009, CAN entered into a "Client Services Agreement" (the "Agreement") with Aqreva's predecessor-in-interest, the Medical Practice Management Division of Eide Bailly LLP. In August 2010, Dr. Sanchez consented to an assignment of the Agreement to Aqreva. It is undisputed that the Agreement

1

identified Aqreva as an independent contractor. Under the Agreement, Aqreva is paid a percentage of bills collected on CAN's behalf.

Julie Axness ("Plaintiff" or "Axness") was a medical assistant at CAN. It is undisputed that she was hired by Dr. Sanchez and was qualified for the position. During the application process, Defendant-Carla Campbell ("Campbell"), a regional supervisor employed by Aqreva, received Axness's application materials and relayed them to Dr. Sanchez. It is disputed to what degree Campbell assisted prospective employees in filling out employment documents for CAN, but it is undisputed that she was authorized as a representative of CAN when filling out these forms. Subsequently, Dr. Sanchez interviewed Axness and offered her the job as an at-will employee. Campbell was not present for the interview. During her time at CAN, Axness was the only full-time employee. Axness's beginning wage was $12 per hour. The wage was raised to $12.36 in October 2012, but it is disputed whether the raise was solely within the discretion of Dr. Sanchez's. One of the undisputed duties provided by Aqreva to CAN, however, was processing payroll checks by calculating the wages based on hours worked and subtracting the appropriate withholdings.

As part of her employ, Axness worked alongside and answered to Dr. Sanchez. Axness's duties at CAN ranged from answering the telephone, contacting or visiting with patients, and handling medications for patients. It is disputed, however, the frequency with which Axness interacted with Campbell in-person or the degree of interaction, generally. The degree of supervision wielded by Campbell over Axness is also contested. The record does, however, contain various emails from Axness to Campbell related to time-off requests, temporary replacements for these various times off, and the like.

While employed at CAN, Axness became pregnant in September 2012. On September 24, 2012, Axness emailed Campbell seeking information relative to CAN's leave policy, the amount of leave CAN would grant, and the potential of hiring a temporary replacement for Axness. Campbell informed Axness that usage of employment agencies in order to fulfill coverage for absences was "cost prohibitive." It is disputed how frequent CAN used employment agencies, but it is not disputed that CAN had used them prior to and subsequent to Axness's employment.

2

Axness also had a conversation with Dr. Sanchez about maternity leave, pay, coverage for Axness in her absence, and the amount of time off available for leave. Campbell was not present for this conversation and it is disputed how involved she was with the maternity leave decision. Sanchez made the initial determination as to Axness's leave and informed Axness that she was entitled to four weeks of maternity leave. It is undisputed, however, that Dr. Sanchez never used the word "guarantee" in relation to maternity leave entitlement. It was also during this time period that Axness was told by Campbell that usage of a temporary employee from an employment agency was "cost prohibitive." Whether Campbell made such a determination independently or through consultation with Dr. Sanchez is one of the primary points of dispute.

During pregnancy, Axness occasionally fell ill or was otherwise unable to work at CAN. When such occasion arose, Axness would contact Dr. Sanchez to inform him and request permission to arrive at work late or not at all. The degree of Campbell's involvement in such requests is disputed. Axness was also hospitalized during her pregnancy. Consequently, she missed several days of work. After receiving approval from Dr. Sanchez, an employment agency was used to temporarily replace Axness during that time.

In order to cover Axness during her maternity leave, Dr. Sanchez requested she secure a replacement for the relevant time period by contacting her previous classmates. When such attempts failed, Dr. Sanchez asked Aqreva to locate a qualified individual. To that end, Campbell placed employment advertisements on a website maintained by KELO-LAND television, a regional news station in Sioux Falls, South Dakota, and sent emails to several of her contacts. During this initial search, a qualified applicant was located who was to cover for Axness during her leave and as necessary prior to Axness's departure. This applicant was offered the job, she accepted, but subsequently reneged. Prior to the potential employee's cancellation, however, Axness was aware of the proposal. She even met the potential replacement and inquired whether the temporary employee would be at CAN in time sufficient for Axness to train her on necessary job duties.

In April 2013, Dr. Sanchez and Campbell explained to Axness that Dr. Sanchez sought to shift from a single full-time employee to two part-time employees. At this time, while it undisputed that Axness vocalized her objection to being reduced to strictly part-time hours, it is disputed whether that objection constituted Axness voluntarily terminating her employment with CAN.

3

On April 19, 2013, Campbell again placed an employment advertisement seeking a certified medical assistant on KELO-LAND's website. On April 22, 2013, Campbell received an application for employment from Tamara Kelly (a/k/a Tami Stenzel) ("Kelly"). On May 6, 2013, Kelly was hired to work for CAN in Axness's stead as a full-time employee. Kelly admits in her deposition that, at the time, she had allowed her certification as a CNA to lapse and when her employment at CAN commenced she had not yet renewed her certification.

On May 6, 2013, Axness underwent a C-section, which was approximately three weeks ahead of her scheduled due date. Several days later, Axness contacted Dr. Sanchez regarding her desire to return to CAN. The undisputed facts are unclear on this point, but the parties seem to agree that Axness requested to bring her newborn with her into CAN's office for the first several weeks of her return. Dr. Sanchez subsequently informed Campbell of Axness's proposal, which was ultimately declined.

On May 23, 2013, Axness received a phone call from Campbell and Dr. Sanchez, both of whom were in CAN's office. The facts surrounding what followed are contested by the parties, but it was during this phone call that Axness's return-to-work proposal was formally declined. Following the phone call, Axness received a release agreement from Campbell, which required she sign the release as a condition of obtaining severance pay from CAN. By signing the agreement, Axness would have agreed not to pursue any employment related charges. It is disputed whether more than severance was withheld as a condition of signing the release. Attached to the release agreement was a note from Campbell requesting that Axness sign the release form before she be sent her final "payroll" check. Axness declined to sign the release agreement.[1]

At the time of Axness's receipt of the separation agreement, she had accrued an additional 1.53 hours of paid time off (PTO). The undisputed facts make clear that at least one person handling Axness's payroll and PTO entitlements was Leann Vaughan ("Vaughan"), an Aqreva employee. Although they had never met in-person, Axness was aware that Vaughan handled payroll for

---

[1] Years prior to Axness's employment, CAN employed DV (initials are being used to protect the former employee's anonymity). In February 2010, DV had injured her ankle and informed Dr. Sanchez. As a result of the injury, DV could not perform her job functions for a sustained period. She was informed that her employment with CAN was terminated due to her inability to perform her job functions. DV was sent a release form similar in fashion to Axness. The primary distinction from the instant case, however, is that DV was terminated after exercising four-weeks of leave.

4

CAN and the two had communicated prior about a separate PTO related issue. On May 14, 2013, Vaughan calculated Axness's wages for April 28 to May 11, 2013. The 1.53 hours of PTO were the result of hours worked by Axness during that period. On May 14, 2013, Vaughan had not been aware that it was Axness's last pay period and did not include the 1.53 hours of PTO in the relevant pay check. On May 28, 2013, Vaughan was told that Axness's employment at CAN had concluded and that Axness was eligible for severance if she signed and returned a release agreement. It is disputed whether oversight caused Vaughan to exclude the PTO from Axness's final check or whether she was instructed to by Campbell pending Axness's signing of the release agreement. The PTO was not paid to Axness until she began a South Dakota administrative proceeding.

Axness subsequently filed a claim with the South Dakota Department of Labor, Division of Human Rights, which found no probable cause for the alleged discrimination claims. Axness appealed to South Dakota's Sixth Circuit Court in Pierre, South Dakota wherein Judge Barnett reversed the DHR. Specifically, Judge Barnett found that, contrary to Aqreva's contentions, submitted evidence supported the allegation that Aqreva operated as Axness's employer and could therefore be found liable for the alleged discrimination.[2] Subsequently, Axness filed Title VII claims in this Court against Aqreva and Campbell. Additionally, South Dakota state law claims have been filed in this Court against Aqreva, Campbell, Dr. Sanchez and CAN. All Defendants have moved for summary judgment on all relevant claims. Additionally, Axness has moved for partial summary judgment as to Aqreva's defense that it was not Axness's Title VII employer.

## DISCUSSION

Summary judgment shall be entered if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn

---

[2] Any preclusive effect of the state court disposition has not been raised by the parties and, thus, will not be addressed by the Court in this memorandum opinion. The preclusive effect of decisions is not a jurisdictional issue. *See Krull v. Jones*, 46 F. Supp. 2d 997, 1002 (D.S.D. 1999) (citing *U.S. v. Metropolitan St. Louis Sewer Dist.*, 952 F.2d 1040, 1043 (8th Cir. 1992)). Rather, claims of preclusion are affirmative defenses and are generally waived by the party entitled to assert them if not pled. *See id.*; *Bechtold v. City of Rosemont*, 104 F.3d 1062, 1068 (8th Cir. 1997).

5

from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). In employment discrimination cases, summary judgment should seldom be granted because intent is often the central issue and claims are often based on inference. *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 857 (8th Cir.2004). Still, employment discrimination cases are not immune from summary judgment, and there is no separate summary judgment standard that applies to these cases. *See Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010).

## I. TITLE VII CAUSES OF ACTION

Before the Court are three separate motions for summary judgment: (1) Plaintiff's motion for partial summary judgment against Defendant-Aqreva and Defendant-Campbell; (2) Aqreva's and Campbell's joint motion for summary judgment; and (3) Dr. Sanchez's and CAN's motion for summary judgment. Each will be analyzed in turn.

## A. WHETHER AXNESS IS ENTITLED TO PARTIAL SUMMARY JUDGMENT AGAINST AQREVA?

Axness moves to, in effect, deprive Aqreva of the defense that it was not Axness's employer within the meaning of Title VII. 42 U.S.C. § 2000e-2(a) reads in relevant part,

> It shall be an unlawful employment practice for an employer
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]

42 U.S.C. § 2000e-2(a)(1). Further, an employer is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year[.] 42 U.S.C. § 2000e.

It is undisputed that Aqreva is an "employer" within the meaning of Title VII. What is disputed, however, is whether Aqreva is Axness's employer for purposes of this action. In an attempt to circumvent the point, Axness highlights that § 2000e-2(a) prohibits an employer from

6

discriminating against "any individual." In essence, Axness maintains that any employer may be liable for discriminating against any employee, even one not employed by the defendant-employer in question, if the discrimination impacts the privileges of the employee's occupation. Such an expansive scope is not supported by other courts' interpretations.

"[I]n order to prevail on [a] Title VII claim, [a plaintiff] must demonstrate that defendants were her 'employer.'" *Moland v. Bil-Mar Foods*, 994 F. Supp. 1061, 1068 (N.D. Iowa dismissed Aug. 02, 1999) (citing *Devine v. Stone, Leyton & Gershman, P.C.*, 100 F.3d 78, 79 (8th Cir.1996)). *See Deal v. State Farm County Mut. Ins. Co. of Tex.*, 5 F.3d 117, 118 (5th Cir.1993) (affirming district court's order dismissing plaintiffs' Title VII and ADEA claims for lack of jurisdiction where plaintiff failed to establish that defendants were her employers); *Shah v. Littlefuse Inc.*, No. 12 CV 6845, 2013 WL 1828926, at *3 (N.D. Ill April 29, 2013) (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991)) ("To maintain a cause of action for discriminatory discharge under Title VII, a plaintiff must allege the existence of an employment relationship"). In *Moland*, the plaintiff "concede[d] that she cannot prevail against defendants on her discrimination claims unless she can demonstrate the existence of an employer-employee relationship with defendants." *Moland*, 994 F. Supp. at 1068. Notwithstanding, the plaintiff there averred "that the extent and nature of the control asserted by defendants over the work and workplace establishe[d] an employer-employee relationship between her and defendants for Title VII purposes." *Id.* To that end, the *Moland* court noted that whether a person qualifies as an "employee" under Title VII turns on federal law. *Id.*

In drawing its conclusions, the *Moland* court noted that three tests have been developed for determining whether a person may be defined as an employee:[3] "(1) the common law agency test . . .; (2) the economic realities test . . .; and (3) the hybrid test, a combination of the common law agency and economic realities tests[.]" *Id.* The *Moland* court noted that the Eighth Circuit had expressly rejected the economic realities test in *Wilde v. County of Kandiyohi*, 15 F.3d 103, 106 (8th Cir. 1994). Instead, the Eighth Circuit applies the hybrid test, which bears no significant distinction from the common law agency test. Applying the hybrid test, the definition of

---

[3] The *Moland* court, without explanation, ceased framing the question as whether the defendant was plaintiff's employer and, instead, analyzed the question as whether plaintiff was an "employee." *See Moland*, 994 F. Supp. at 1068. Presumably, the court meant to ascertain if plaintiff was an "employee" of the defendant-employer. In any event, the two frameworks appear to be interchangeable.

7

"employee" is interpreted against the backdrop of common law precepts. *Moland*, 994 F. Supp. at 1069 (quoting *Wilde*, 15 F.3d at 105). The test accounts for numerous factors related to the employment relationship; no one, however, is dispositive.

> This [hybrid] test calls for application of general principles of the law of agency to undisputed or established facts. Consideration of all of the circumstances surrounding the work relationship is essential, and no one factor is determinative. Nevertheless, the extent of the employer's right to control the "means and manner" of the worker's performance is the most important factor to review here, as it is at common law.... If an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist.

*Id.* at 1069-70 (quoting *Spirides v. Reinhardt*, 613 F.2d 826, 831-32 (D.C. Cir. 1979)) (alteration in original).[4]

With the foregoing in mind, Axness has not adequately borne her burden of proof as to her motion for summary judgment on the issue of "direct employment." Although the record does contain evidence that Aqreva was her "employer," so that direct employer claim can be submitted to the jury. The application for employment Axness completed for the position at CAN referenced Aqreva as the employer. Moreover, deposition testimony suggests that Campbell and Aqreva supervised, trained, and reprimanded employees of CAN. The facts giving rise to this cause of action are disputed and Aqreva correctly points out that Axness, in her deposition, seemed to understand Dr. Sanchez as her supervisor and wielded ultimate authority. Thus, while, as a matter of law, Aqreva is an employer within the meaning of Title VII, a genuine issue of material fact remains whether it is Axness's employer. The finder of fact will make that determination after being instructed on Title VII and Eighth Circuit law. *See Bryson v. Middlefield Volunteer Fire Department, Inc.*, 656 F.3d 348, 352 (6th Cir. 2011) (quoting

---

[4] The D.C. Circuit Court of Appeals in *Spirides* listed 11 other factors for consideration:
(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.
*Spirides*, 613 F.2d at 832.

*Simpson v. Ernst & Young*, 100 F.3d 436, 439 (6th Cir. 1996), *cert. denied*, 520 U.S. 1248.)
("Whether the Department is an 'employer' for purposes of Title VII, '*[i]n the absence of a
conflict of material fact*, ... is appropriate for the court to resolve ... as a matter of law'")
(emphasis added)). *See also Lilley v. BTM Corp.*, 958 F.2d 746, 750 n. 1(6th Cir. 1992) ("The
determination of employment status is a mixed question of law and fact. Normally, a judge will
be able to make this determination as a matter of law. However, where there is a genuine issue of
fact or conflicting inferences can be drawn from the undisputed facts . . . the question is to be
resolved by the finder of fact in accordance with the appropriate rules of law.").

Notwithstanding the determination of Aqreva's "direct employment" status, *supra*, Axness also
argues, in the alternative, that Aqreva may be held liable based on an "indirect employment"
theory of liability. Specifically, Axness asserts that doctrine developed by the D.C. Circuit in
*Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir.1973), has application here. The
*Sibley* court articulated that a defendant may be held liable as a Title VII employer if the
defendant wields a sufficient amount of control over a plaintiff's job market access, "i.e.,
sufficient control over plaintiff's employment opportunities." *Moland*, 994 F. Supp. at 1071.
Like the instant case, the defendant in *Sibley* argued that it could not be held liable under Title
VII as it was not the plaintiff's "employer" within the Act's meaning. *Sibley*, 488 F.2d at 1340.
In ruling against the defendant on its motion for summary judgment, the *Sibley* court held that

> Control over access to the job market may reside, depending upon the
> circumstances of the case, in a labor organization, an employment agency, or an
> *employer as defined in Title VII*; and it would appear that Congress has
> determined to prohibit each of these from exerting any power it may have to
> foreclose, on invidious grounds, access by any individual to employment
> opportunities otherwise available to him. To permit a covered employer to exploit
> circumstances peculiarly affording it the capability of discriminatorily interfering
> with an individual's employment opportunities with another employer, while it
> could not do so with respect to employment in its own service, would be to
> condone continued use of the very criteria for employment that Congress has
> prohibited.

*Id.* at 1341 (emphasis added). Accordingly, a party falling outside the "direct employer"
relationship with an employee-plaintiff may still be liable for employment discrimination as an
"indirect employer." The Eighth Circuit has not ruled on the applicability of the *Sibley* doctrine.
Thus, it is appropriate to again turn to *Moland* for guidance. There, the Iowa District Court noted

9

that the Eighth Circuit had not yet considered the indirect employer issue. The *Moland* court found persuasive that many courts across the country have adopted the *Sibley* doctrine. *See Moland*, 994 F. Supp. at 1072 (citing *Zaklama v. Mt. Sinai Medical Ctr.*, 842 F.2d 291, 294 (11th Cir.1988) ("[O]ther federal courts have held that, based on the language of § 2000e–2(a)(1), Congress clearly intended that Title VII would extend beyond the immediate employer-employee relationship under certain circumstances."); *King v. Chrysler Corp.*, 812 F.Supp. 151, 153 (E.D. Mo.1993). Finding in favor of *Sibley*'s applicability, the *Moland* court found that a classic context for *Sibley* application results when a defendant controls access to employment opportunities of a third-party's employee and obstructs such employment based on impermissible criteria. *Moland*, 994 F. Supp at 1073. Ultimately, the *Moland* court ruled that "42 U.S.C. § 2000e–2 applies where an employer controls an individual's access to employment opportunities and denies that access based on unlawful criteria even though the individual is not an employee of that employer." *Id.*

Here, Axness has pled facts sufficient enough to bring a *Sibley* cause of action in addition to a direct employer claim. Viewing the undisputed facts most favorable to Aqreva, however, genuine issues of material fact remain as to whether Aqreva maintained a sufficient degree of control over Axness's employment at CAN. As explained, *supra*, regarding "direct employment," deposition testimony from Axness indicates that she understood Dr. Sanchez to be her supervisor and the one making ultimate decision as to her employment status. Whether Aqreva, by way of Campbell, retained sufficient control over Axness's employment is a question of fact to be decided by the factfinder. Accordingly, Axness's motion for partial summary judgment is denied.[5]

---

[5] There remains a third avenue through which Axness could conceivably hold Aqreva liable as her employer, but one not pled by Axness. The Eleventh and Seventh Circuits, and various lower courts, have recognized a "joint employer" doctrine. To so find two entities intertwined as joint employers, they must "'contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees[.]'" *Wilborn v. Southern Union State Community College*, 720 F. Supp. 2d 1274, 1294 (D. Ala. 2010) (quoting *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1341 (11th Cir. 2010)). *See Shah*, 2013 WL 1828926, at *3 ("The Seventh Circuit has recognized joint employer status between a temporary services agency and its client in the labor law context where two employers exert significant control over the same employees.") (internal quotations omitted).

10

B. WHETHER AQREVA AND CAMPBELL ARE ENTITLED TO SUMMARY JUDGMENT AGAINST AXNESS?

Aqreva moves for summary judgment as to each of Axness's claims. This section will be confined to the Title VII claims and the claims based on South Dakota law will be discussed in Part.II., *infra*.

1. Aqreva moves to dismiss Axness's 42 U.S.C. § 2000e-2(a)(1) discrimination claim, arguing that it is not her Title VII "employer."

Aqreva's motion for summary judgment as to Axness's § 2000e-2(a)(1) claim, which operates as a cross-motion to Axness's motion for partial summary judgment, seeks for this Court to hold that Aqreva was not Axness's employer as a matter of law. Rather than restating the foregoing, the discussion *supra* applies here and will be incorporated. Taking the undisputed facts now in light most favorable to Axness, genuine issues of material fact remain and Aqreva's motion based on § 2000e-2(a)(1) is denied. As discussed above, the record is replete with disputes. Moreover, inferences drawn from the undisputed facts are susceptible of favoring either side. For example, the application for employment, discussed *supra*, references Aqreva as Axness's employer; deposition testimony of Dr. Sanchez suggests that mechanisms of CAN's business were controlled by Campbell; and deposition testimony of Kelly indicates her understanding that Campbell controlled the Human Resources component of CAN. Thus, much of the case turns on the credibility of evidence and witnesses. Such an assessment is within the province of the factfinder.

Finding that genuine issues of material fact exist as to whether Aqreva was Axness's employer, the Court need then turn to the merits. When Congress enacted the Pregnancy Discrimination Act (PDA) in 1978, it amended the definitional provisions of Title VII to clarify that discrimination "on the basis of pregnancy, childbirth, or related medical conditions" is sex discrimination under Title VII. The PDA states that pregnant women must "be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." *See* 42 U.S.C. § 2000e(k).

A Title VII sex discrimination plaintiff who seeks to withstand a defendant's motion for summary judgment must meet the burden shifting framework of *McDonnell Douglas Corp. v.*

11

*Green*, 411 U.S. 792, 802-04 (1973). *See E.E.O.C. v. Trans States Airlines, Inc.*, 462 F.3d 987, 991-992 (8th Cir. 2006). Axness, however, also brings a claim against Aqreva and Campbell under S.D.C.L. § 20-13-10, which is South Dakota's 42 U.S.C. § 2000e-2(a)(1) analogue. These same state law claims are also raised against Dr. Sanchez and CAN. South Dakota courts examine claims under SDCL § 20-13-10 under a standard identical to that applied to Title VII claims. *See Huck v. McCain Foods*, 479 N.W.2d 167, 169 (S.D. 1991). Thus, because the Title VII and South Dakota law claims hinge on the same factual allegations, rather than duplicating recitation of the law and its application, the two will be combined and discussed in Part.II.A., *infra*.

2. Aqreva moves to dismiss Axness's 42 U.S.C. § 2000e-2(b) discrimination claim, arguing it is not a Title VII "employment agency."

Axness also seeks to hold Aqreva liable as an "employment agency" under 42 U.S.C. § 2000e2(b). That section reads,

> It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.

42 U.S.C. § 2000e2(b). 42 U.S.C. 2000e(c) defines "employment agency" as "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person." Thus, akin to Title VII employers, employment agencies may not discriminate against employees based on unlawful criteria. Axness, however, does not allege that Aqreva refused to refer her for employment based on discriminatory animus. Instead, she relies on the "or otherwise to discriminate clause" for purposes of this discrimination claim. As a threshold matter, it must be determined if Aqreva meets the definition of a Title VII "employment agency."

12

The contours of what constitutes "employment agencies" are unclear and few courts have confronted the issue as this section of Title VII is not often litigated.[6] When confronted with the issue, however, a California District Court noted that Congress's usage of the word "regularly" suggested that "Congress had in mind to include only those engaged to a significant degree in that kind of activity as their profession or business." *Brush v. San Francisco Newspaper Printing Co.*, 315 F. Supp. 577, 580 (D.C.A. 1970). "*Brush* 's approach is not particularly complex, essentially requiring a close reading of the statute. Its interpretation . . . underlines that Congress intended Title VII to apply only to those that act regularly as employment agencies, not those that might occasionally refer a potential employee to someone else." *Scaglione v. Chappaqua Central School Dist.*, 209 F. Supp. 2d 311, 316 (D.N.Y. 2002).

An Alabama District Court also dealt with the definition of "employment agency" in *Wilborn v. Southern Union State Community College*, 720 F. Supp. 2d 1274 (M.D. Ala. 2010). There, the plaintiff was involved in a truck driver vocational program. She was the lone female participant in 2007. The program was meant to train participants as truck drivers and place them with an employer upon the training's completion. During her time in the program, the plaintiff was subjected to a host of sexual advances and discriminatory conduct. As a result, she unenrolled in the program and brought suit. The defendants contended that the Title VII cause of action was not maintainable as they were neither the plaintiff's "employer" nor an "employment agency" with respect to the plaintiff. In response, the plaintiff asserted that the defendants were not her employer in a traditional sense, "but rather that in relation to her they acted as an 'employment agency' under Title VII." *Wilborn*, 720 F. Supp. at 1290. The *Wilborn* court noted first that, as explained above, to fall under the protection of § 2000e-2(b), the entity in question must qualify as an employment agency. *Id.* at 1291 ("[T]he court agrees that an entity would not be an employment agency within the meaning of Title VII if it never, rarely, or even occasionally sought to secure employees for an employer.") (internal quotations omitted). In finding that the defendants qualified as an employment agency, the *Wilborn* court observed that "the program billed itself as a 'highly intensive occupational training program with the end result being

---

[6] What is required of an employment agency when issuing referrals for employment was an issue of first impression for the Eighth Circuit in *E.E.O.C. v. Kelly Services, Inc.*, 598 F.3d 1022 (8th Cir. 2010). There, the Eight Circuit examined § 2000(e)-2(b) as it related to a Muslim adherer's religious beliefs. Offering little instruction for purposes of the instant case, the court was confronted squarely with § 2000(e)-2(b)'s "fail or refuse to refer" clause and offered no illumination for the subsequent "or otherwise to discriminate" clause.

employment in the field.'" *Id.* The court went on to note that the defendant-program "actively assist[ed] participants in the job search process." *Id.*

Similar to what was found in *Wilborn*, Axness has presented evidence sufficient to raise a genuine issue of material fact that Aqreva operated as an employment agency. Comparable to the case at bar, in *Wilborn*, the defendants there aided their participants in finding employment and placing them with employers. Here, evidence exists showing Aqreva, through Campbell, regularly sought temporary employment to be placed at CAN when requested by Dr. Sanchez or Axness. To emphasize the point, Axness argues that Campbell assisted Dr. Sanchez and CAN in "staying staffed." (Amended Complaint at 11). While not placing Axness directly, Aqreva still sought and placed employees with another employer, i.e., CAN.

Thus, viewing the undisputed facts most favorable to Axness, she has satisfied the threshold definitional requirement. Similar to the definitional determination a jury may be asked to make as to an "employer," whether an entity acts with sufficient regularity as an "employment agency" for purposes of Title VII is also a proper question for the jury. Therefore, like what was found in *Wilborn*, "Presented with the evidence [], a reasonable jury could conclude that [Aqreva] 'regularly under[took] . . . to procure for employees opportunities to work' for [CAN]." *Wilborn*, 720 F. Supp. at 1292 (third alteration in original). The record shows that Campbell placed advertisements with KELO-LAND television, sought employees directly from other agencies for placement at CAN, and aided employees in completing CAN's employment paperwork. Axness has submitted sufficient evidence demonstrating that Aqreva may qualify as a Title VII employment agency and the Court will now turn to the merits of the claim.

Having found that Aqreva qualifies, for the purposes of this summary judgment motion, as a Title VII employment agency, some courts would hold that Axness must demonstrate that the alleged discrimination relates to Aqreva's capacity as an employment agency. "The few courts that have addressed the liability of employment agencies under Title VII have held that 'the scope of prohibited practices is limited' in comparison to discrimination cases involving actual employers." *Shah*, 2013 WL 1828926, at \*7 (quoting *E.E.O.C. v. Kelly Services, Inc.*, 598 F.3d 1022, 1030 (8th Cir. 2010)). *See Koger v. Allegheny Intermediate Unit*, No. Civ. A. 10–1466, 2012 WL 603565, at \*12 (W.D.P.A. Feb. 24, 2012) (finding that employment agencies can be held liable insofar as the discrimination is rooted in employment "referrals, failure to refer, or

14

other discriminatory practices relating to referrals."); *Kellam v. Snelling Personnel Services*, 866 F. Supp. 812, 817 (D. Del. 1994) ("This Court understands the language 'or otherwise to discriminate' to modify the phrase 'to fail or refuse to refer for employment' and thereby encompass prohibited discrimination with respect to referrals that fall short of failure or refusal to refer.").

To refute *Kellam*'s and other courts' narrow interpretations of the "or otherwise to discriminate" clause, Axness relies exclusively on *Wilborn*. In *Wilborn*, the court rejected the *Kellam* holding that the "or otherwise to discriminate" clause should be read so narrowly. Noting that Congress, by enacting 42 U.S.C. § 2000e-2(a), clearly intended that employees not suffer discriminatory conduct from the employer, the Alabama District Court refused to "assume that Congress nonetheless intended to allow that the same gauntlet be run in return for the privilege of being referred for employment." *Wilborn*, 720 F. Supp. at 1293. Here, the evidence does support the argument that Aqreva was acting as an employment agency. The *Wilborn* court noted explicitly its contention that those seeking employment through an employment agency should not be subjected to employment discrimination as a prerequisite for aid in securing employment elsewhere. That reasoning applies here, as explained below.

Aqreva, contrary to what the *Wilborn* court found, urges that the "or otherwise to discriminate clause" of 42 U.S.C. § 2000e2(b) should apply only when an employment agency discriminates in its capacity as such, that is, in its operations of referring employees for employment. Specifically, Aqreva argues that this Court should apply the reasoning articulated in *Kellam* and not "uncouple" the "or otherwise to discriminate" clause from the failure to refer language of § 2000e2(b). The Court does not agree. While the record contains no evidence that Aqreva referred Axness herself for employment, a jury may still find Aqreva to be a Title VII employment agency in that it placed other employees with CAN in an effort to unlawfully discriminate against Axness. Axness, moreover, argues that the relevant referral was Axness's request that Campbell secure temporary employment during Axness's maternity leave. In any event, the Court adopts the *Wilborn* statement:

> [T]he court finds it unreasonable to assume that Congress intended that a prospective employee must endure a sexually "hostile environment" in order to obtain employment, when the same conditions would give rise to a cause of action in a place of employment. The Eleventh Circuit Court of Appeals has cautioned

15

> against "a requirement that a man or woman run a gauntlet of sexual abuse in
> return for the privilege of being allowed to work and make a living." *Henson v.
> City of Dundee*, 682 F.2d 897, 902 (11th Cir.1982). This court will not assume
> that Congress nonetheless intended to allow that the same gauntlet be run in
> return for the privilege of being referred to employment.

*Wilborn*, 720 F. Supp. at 1293. As the *Sibley* court held when pronouncing its "indirect

employer" theory of liability, "Control over access to the job market may reside, depending upon

the circumstances of the case, in a labor organization, an employment agency, or an employer as

defined in Title VII[.]" *Sibley*, 488 F.2d at 1341. Thus, just as the Court adopts *Sibley*'s indirect

theory of liability as it pertains to "employers," it likewise lengthens that endorsement to

"employment agencies." Accordingly, the Court finds that the "or otherwise to discriminate

clause" of 42 U.S.C. § 2000e2(b) may form the basis of Axness's claim for relief. As such, the

finder of fact would be required to determine if Aqreva, as an employment agency, controlled

Axness's access to employment at CAN to such a degree to be liable for sexual discrimination

based on, what will be termed, an "indirect employment agency" theory of liability.

The next question is whether Axness has sufficiently shown that Aqreva discriminated against

her, in its capacity as an employment agency, in violation of Title VII and the PDA. Akin to an

employer's alleged discrimination, whether or not a nonmoving party can withstand a defendant-

employment agency's motion for summary judgment must be analyzed under *McDonnell-*

*Douglas*. Thus, that analysis will be combined with Part I.B.1., *supra*, and discussed in a single

section in Part II.A., *infra*.

3. Aqreva moves to dismiss Axness's 42 U.S.C. § 2000e-3(a) retaliation claims, arguing that it is

not a Title VII "employment agency."

Deciding, *supra*, that Axness has carried her burden and that the question of Aqreva's status as a

Title VII "employment agency" rests with the factfinder, the Court will turn to the merits of

Axness's "employment agency" retaliation claim. Similar to the discrimination claims discussed

in Parts I.B.1-2., *supra*, once the threshold definitional question has been parsed, the familiar

*McDonnell Douglas* framework is applied to the merits of the retaliation claim. Because Axness

also brings state law retaliation claims, which are analyzed under the same rubric as Title VII,

this section will be combined with the state law claims and discussed, *infra*, in Part II.C.

16

4. Aqreva moves to dismiss Axness's 42 U.S.C. § 2000e-3(a) retaliation claim, arguing that it is neither a Title VII "employment agency" nor Axness's Title VII "employer."

42 U.S.C § 2000e-3(a) makes it

> unlawful employment practice for *an employer* to discriminate against any of his employees or applicants for employment, for *an employment agency*, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (emphasis added). Genuine issues of material fact remain, as discussed in Part I.B.1.-3., *supra*, relative to whether Aqreva is Axness's "employer" and/or "employment agency" for purposes of Title VII. Thus, for purposes of Aqreva's motion for summary judgment, the merits of the claim will be turned to. As discussed, Axness brings retaliation claims under both Title VII and South Dakota law. Under either statutory scheme, the *McDonnell Douglas* burden-shifting framework applies. *See Wilborn*, 720 F. Supp. at 1301. Thus, both will be combined and discussed together with the state law retaliation claims in Part II.C., *infra*.

5. Arqreva moves to dismiss Axness's claim for punitive damages under 42 U.S.C. § 1981a.

In a Title VII action, punitive damages are available if a plaintiff shows that her employer engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights" of the victim of discrimination. 42 U.S.C. § 1981a(b)(1). The Supreme Court has explained that "'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.'" *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999). For an employer to be liable for punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Id.* at 536. The employee need not show that the employer engaged "in conduct with some independent, 'egregious' quality." *Id.* at 538. If a plaintiff-employee shows that another employee of the company acted with the requisite malice or reckless indifference, the plaintiff must then show that this employee's mental state can

17

be imputed to the employer. *Id.* at 539. The malice or reckless indifference of employees serving in a managerial capacity and acting within the scope of their employment may be imputed to the employer. *Id.* at 543. An employer may avoid liability for punitive damages, however, if it shows that the employee's actions "are contrary to the employer's good-faith efforts to comply with Title VII." *Id.* at 545; *E.E.O.C. v. Siouxland Oral Maxillofacial Surgery Associates*, L.L.P., 578 F.3d 921, 925 (8th Cir. 2009). If an employer discriminates in contravention of its own policies, however, the existence of those policies does not allow the employer to escape punitive damages. *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 931 (8th Cir. 2004).

Instructive on the issue of punitive damages is *Siouxland Oral*. There, the EEOC brought charges on behalf of two plaintiffs who were fired and not hired, respectively, based on the two women being pregnant at the time. A jury found that Siouxland Oral had impermissibly discriminated against the women in violation of Title VII and the PDA. As a result, the plaintiffs were awarded separate amounts representing back-pay and were awarded attorney fees. The District Court ruled as a matter of law, however, that punitive damages were not warranted. The EEOC appealed to the Eighth Circuit, which reversed the District Court's ruling as to punitive damages. In so holding, the Eighth Circuit found that the evidence submitted "was sufficient for a jury to find that Siouxland acted in the face of a perceived risk that it was violating [Plaintiffs'] Title VII rights. With respect to [Plaintiff-]Dooley, the EEOC presented evidence that [the Defendant], who ordered Dooley's termination, knew that pregnancy discrimination was illegal."

At the outset, Aqreva argues that it cannot be found liable for punitive damages as it is not Axness's employer. As was discussed in Part I., *supra*, however, genuine issues of material fact remain as to Aqreva's status as Axness's Title VII employer and summary judgment on that point alone is denied. Moreover, it has been properly alleged by Axness that Campbell was acting within the scope of her employment with Aqreva making any malice imputable to Aqreva. Lastly, as pointed out in Axness's brief in opposition, Campbell has been working as a human resources officer for 18 years and stated in her deposition that the pregnancy of a prospective employee should not be considered in the context of employment. Knowing that much to be true, the evidence in the record shows that Axness was terminated two-weeks into her four-week maternity leave and replaced by a woman who was not pregnant and not yet certified as a CNA

18

(*see* Tamara Kelly Depo). Thus, the question of punitive damages becomes one ripe for jury consideration and not as a matter of law. Aqreva's motion for summary judgment is denied.

## II. SOUTH DAKOTA LAW CAUSES OF ACTION

Along with the various Title VII claims brought against Aqreva and Campbell, Axness brings several South Dakota state law claims against Aqreva, Campbell, Sanchez, and CAN.

## A. WHETHER DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST AXNESS ON HER CAUSE OF ACTION FOR SEX DISCRIMINATION UNDER SDCL § 20-13-10 AND TITLE VII?

SDCL § 20-13-10 provides:

> It is an unfair or discriminatory practice for any person, because of race, color, creed, religion, sex, ancestry, disability, or national origin, to fail or refuse to hire, to discharge an employee, or to accord adverse or unequal treatment to any person or employee with respect to application, hiring, training, apprenticeship, tenure, promotion, upgrading, compensation, layoff, or any term or condition of employment.

As mentioned in Parts I.B.1.-2., *supra*, South Dakota courts examine claims under SDCL § 20-13-10 under a standard identical to that applied to Titled VII claims, so that law will be applied here. *See Huck v. McCain Foods*, 479 N.W.2d 167, 169 (S.D. 1991).

A plaintiff who claims employment discrimination may survive a motion for summary judgment either by offering "direct evidence" of discrimination, or by creating the requisite inference of unlawful discrimination through the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See E.E.O.C. v. Trans States Airlines, Inc.*, 462 F.3d 987, 991-992 (8th Cir. 2006). "'[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'" *Quick v. Wal-Mart Stores, Inc.*, 441 F.3d 606, 609 (8th Cir. 2006) (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). Direct evidence in employment discrimination cases must be distinguished from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process. *Quick v. Wal-Mart Stores, Inc.*, 441 F.3d at 609. Instead, direct evidence is "'evidence

of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to infer that attitude was more likely than not a motivating factor in the employer's decision.'" *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993) (quoting *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992)).

If a plaintiff presents direct evidence of sex discrimination, the burden rests with the employer to show that it more likely than not would have made the same decision without consideration of the illegitimate factor. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989). Evidence of the employer's motives for the action, and whether the presence of mixed motives defeats the plaintiff's claim, is a trial issue, and not one intended for summary judgment. At the summary judgment stage the issue is simply whether the plaintiff has presented sufficient evidence that unlawful discrimination was a motivating factor in the adverse employment action. *Griffith v. City of Des Moines*, 387 F.3d 733, 735 (8th Cir. 2004). If a plaintiff presents direct evidence of discrimination, the *prima facie* case stage of the *McDonnell Douglas* test may be avoided because there is no need for the plaintiff to create an inference of discrimination. *See Adams v. Nolan*, 962 F.2d 791, 795 n.6 (8th Cir. 1992). *See also Carney v. Martin Luther Home, Inc.*, 824 F.2d 643, 648 (8th Cir. 1987).

Here, Axness's "direct" evidence is not enough to raise a genuine issue of fact about the existence of intentional discrimination. Her claim that the sole reason she had to be off work and thus, according to Campbell and Sanchez, had to be replaced, was due to her pregnancy and childbirth. This does not directly allege, and thus cannot directly prove, discriminatory intent. As is often the case, Axness must rely instead on circumstantial evidence.

The Court must then consider Axness's claims under the burden-shifting method of proof established by *McDonnell Douglas*. To establish a *prima facie* case of sex discrimination under the *McDonnell Douglas* framework, a plaintiff must prove that she (1) is within the protected class, (2) was qualified to perform her job, (3) suffered an adverse employment action, and (4) presents facts that give rise to an inference of sex discrimination. *Holland v. Sam's Club*, 487 F.3d 641, 644 (8th Cir. 2007). Defendants concede the first two factors. As to the third factor, Defendants argue that Axness "voluntarily quit" her job to show that she was not subject to an adverse employment action by reason of pregnancy. But both the terms under which she left and

her expectations, taken in the light most favorable to Axness, show that she thought she was taking a leave. Other testimony also contradicts Defendants' claim that Axness quit. Kelly testified that they were looking for someone to fill in for maternity leave, and Campbell testified that the plan was to have Axness share a full time schedule with another employee. Defendants' paperwork also indicates that Axness was "terminated" and that her separation was "involuntary." At the very least, there is a question of fact whether Axness suffered an adverse employment action and it is for the jury to decide.

The last requirement of a *prima facie* case is showing that the facts give rise to an inference of sex discrimination. Here, taking the factual allegations as true, Axness has adequately alleged facts to raise an inference of discrimination. Her Amended Complaint, deposition, and other testimony clearly show a close temporal proximity between her pregnancy and her termination. She kept in close touch with Sanchez and Campbell and tried to work with them on scheduling and accommodations to allow her to continue working. Instead, she was terminated. Taking her allegations as true and drawing all reasonable inferences in Axness's favor, she has met her burden of alleging sufficient facts to raise an inference of discrimination.

By establishing her *prima facie* case, Plaintiff raises a rebuttable presumption that Defendants unlawfully discriminated against her. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993). The burden of production then shifts to Defendants, who must articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by Plaintiff. *See McDonnell Douglas*, 411 U.S. at 802. Defendants' burden at this stage is one of production, not persuasion. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–56 (1981). If a defendant is able to articulate a facially nondiscriminatory reason for the adverse employment action, the plaintiff can avoid summary judgment only if she can show that her pregnancy was a determinative factor in the defendant's employment decision, or show the defendant's explanation for its action was merely pretext. *Adams v. Nolan*, 962 F.2d 791, 975 (8th Cir. 1992). Thus, although the burden of production shifts from Plaintiff to Defendants and back to Plaintiff under the *McDonnell Douglas* framework, the ultimate burden of proving intentional discrimination is borne by Plaintiff. *See Hicks*, 509 U.S. at 507.

In the second step of the *McDonell Douglas* analysis, Defendants proffer a number of facially nondiscriminatory reasons for Axness' termination: (1) Axness quit; (2) they are disinclined to

21

hire temporary workers; (3) Axness was replaced only after indicating she would not be able to work part-time; and (4) Axness was replaced only after she said she would have to bring her baby with her to work. Because the burden at this step is only one of production and not of persuasion, the burden switches back to Axness under the *McDonnell Douglas* framework to show that her pregnancy was a determinative factor and the Defendants' explanations are a pretext for discrimination.

Axness may succeed in this third step of the *McDonnell Douglas* analysis "by showing that the employer's proffered explanation is unworthy of credence." *Adams v. Nolan*, 962 F.2d at 795. "Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext." *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 703 (8th Cir. 1994). "[R]ejection of the defendant's proffered reasons ... will permit the trier of fact to infer the ultimate fact of intentional discrimination, and ... upon such rejection, no additional proof of discrimination is required." *Id.* "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional discrimination." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) (emphasis added).

Axness has presented evidence that Sanchez's position has changed a number of times. He claimed that Axness voluntarily quit for the first time when the motion for summary judgment was filed. When his deposition was taken, Dr. Sanchez testified that Axness's alleged insistence on bringing her baby to work with her "was 99 percent of the reason" why she was terminated. (Sanchez depo at 69-70.) Axness has also shown that she agreed to come back to work part time; Dr. Sanchez testified to that. (Sanchez depo at 71.) The record also shows that Dr. Sanchez had used temporary workers on many occasions, before and after Axness gave birth. (Ex.P at 125-26; Ex. Q at 398; Ex.W at 23; Ex. T at 333, 334, 326; Ex. W at 23.) The jury could conclude from this evidence that Dr. Sanchez's and Campbell's proffered reasons are pretextual and that the real reason behind the termination was to unlawfully discriminate based on Axness's pregnancy. Thus, summary judgment is denied under the *McDonnell Douglas* burden-shifting framework as to both the Title VII and state law discrimination claims.

22

B. WHETHER DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST
AXNESS ON HER CLAIMS (OTHER THAN HER RETALIATION CLAIM) UNDER SDCL
§ 20-13-26?

In addition to her state law retaliation claim, Plaintiff brings the following claims against Dr.
Sanchez and the other defendants under SDCL § 20-13-26:

> (1) The four Defendants, "aid[ed]," "abet[ted]," and "induce[d]" one other
> throughout their treatment of Axness;
> (2) The four Defendants "engage[d]" and "threaten[ed] to engage in any reprisal,
> economic or otherwise," against Axness by withholding Axness's entire payroll
> check, including her unused PTO and severance pay, unless she signed a release;
> (3) The four Defendants, attempted to "conceal" their discriminatory actions
> against Axness by withholding Axness' s entire payroll check, including her
> unused PTO and severance pay, until she signed a release;
> (4) The May 29, 2013, letter, including Campbell's note and the release,
> constitutes a "trick" or "device" in violation of SDCL 20-13-26.

(Doc. 49 at 25.) Axness admits there is no case law pertaining specifically to SDCL § 20-13-26,
but she argues that the legislature obviously intended to protect individuals "from more than just
the unlawful discrimination prohibited in SDCL § 20-13-10. Stated differently, South Dakota
also protects its workers from the pressures and deceptive acts that might be used by others to get
away with unlawful discrimination. (Doc. 49 at 32.) As Axness points out, defendants are
subject to punitive damages for violating SDCL § 20-13-26, but not for violating § 20-13-10, so
the former statute is directed against people who do more than discriminate. It is meant for
defendants like those in this case who work collectively to fire an employee due to pregnancy
and then attempt to conceal their actions by deceiving the employee into signing a release in
exchange for payment she was already entitled to receive, i.e., two weeks' severance pay. Even
though there is no case law pertaining to SDCL § 20-13-26, this Judge was in the South Dakota
legislature in 1972 and wrote and was the principle sponsor of the bill that became SDCL 20-13.
The Legislative Research Council did not write the bill, the legislator did the writing. Plaintiff's
interpretation is correct and the Court would so find even if it had not personally drafted the
legislation.

Dr. Sanchez asserts that he simply received help from Aqreva running his business, nothing more
and nothing less. He argues that payment of two weeks' severance pay to Axness was

23

conditioned on her signing a Release of all claims against him and Aqreva, and argues that is not illegal. Dr. Sanchez also argues that sending her the release was in no way a trick or device to facilitate discrimination.

It is not for the Court to determine whether Axness can prove that Defendants engaged in what will be termed, for ease of reference, conspiracy to discriminate and conceal said discrimination, or whether they were simply engaging in what they thought were appropriate business decisions. Axness has at least raised a material issue of fact sufficient to defeat summary judgment in favor of Defendants.

## C. WHETHER DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST AXNESS ON HER TITLE VII AND STATE LAW RETALIATION CLAIMS?

The parties agree that the last portion of SDCL § 20-13-26 protects against retaliation. Moreover, it is agreed that 42 U.S.C § 2000e-3(a) "makes it unlawful for employers to retaliate against an employee or applicant for employment because she 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Brower v. Runyon*, 178 F.3d 1002, 1005 (8th Cir. 1999) (quoting 42 U.S.C. § 2000e-3(a)).

To make out a case of retaliation, a plaintiff must show: "(1) she engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection existed between participation in the protected activity and the adverse employment action." *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 713-14 (8th Cir. 2000). Upon establishing a *prima facie* case, the burden shifts to the defendant-employer to produce some legitimate, non-discriminatory reason for the action. *See id.* at 714; *Stevens v. St. Louis University Med. Ctr.*, 97 F.3d 268, 270-72 (8th Cir. 1996) (the burden-shifting analysis of *McDonnell Douglas* applies to Title VII retaliation claims.) If the employer satisfies this burden, the plaintiff must show that the proffered reason for the adverse action is pretext. *Id.*

Regarding the first prong of the *prima facie* case for retaliation, protected activity, Axness claims that her refusal to sign the Release and bringing a discrimination claim against Defendants constituted protected activity. The Court agrees. Regarding the second prong, adverse employment action, the Court also agrees that withholding her unused paid time off and her severance pay amounts to adverse action. Regarding the third prong, causal link, there is a

24

question of fact whether the severance pay and whether the paid time off were withheld in retaliation for Axness' refusal to sign the Release of her sex discrimination claims. Defendants maintain that the Court should grant summary judgment in their favor because the fact that Axness did not receive her accrued 1.53 hours of PTO was an oversight, and the offer of severance pay was contingent on signing the Release, which Axness declined to do. But there is sufficient evidence to find a *prima facie* showing of a causal connection between withholding of the severance pay and Axness' protected activity.

Aqreva argues that Axness cannot, as a matter of law, make out a *prima facie* case of retaliation under Title VII due to the protected activity arising after the alleged retaliatory conduct. Aqreva cites to *Runyon* for this argument. In *Runyon*, the plaintiff, a former USPS employee, believed she had been discriminated against by USPS and sought the opinion of an Equal Employment Opportunity (EEO) counselor. Maintaining that her engagement of the EEO counselor caused USPS to retaliate, the plaintiff brought a Title VII claim. Thus, the issue before the Eighth Circuit dealt with the contours of "protected activity." Finding that the plaintiff had not technically engaged in a protected activity, the *Runyon* court held,

> Not all discussions with individuals who are part of the Title VII grievance process or all informal complaints will amount to participation in a Title VII proceeding[]. At a minimum there would have to be factual allegations of discrimination against a member of a protected group and the beginning of a proceeding or investigation under Title VII.

*Runyon*, 178 F.3d at 1006. Contrary to *Runyon*, however, the instant case includes the filing of an EEOC charge, which is indisputably a protected activity. Aqreva argues that *Runyon* stands for the proposition that retaliation claims must adhere to strict chronology, i.e., a protected activity followed by retaliatory conduct plus a causal link. Such a strict view of *Runyon* distorts its instruction. The timing, or chronology, of events in *Runyon* was crucial due to the timing being the *Runyon* plaintiff's only causal link. As the *Runyon* court noted, "An inference of retaliatory motive *may be* supported by evidence that the defendant was aware of protected activity *and that the date of the adverse employment action closely followed such activity.*" *Id.* (emphasis added). Accordingly, timing can be circumstantial evidence to show a temporal relationship and the circumstantial evidence of retaliatory conduct. It appears that Axness herself agrees that the alleged retaliation antedated the protected activity. With regard to timing of

events affecting a retaliation claim, see *Stewart v. Rise, Inc.*, Slip Op., No. 13-3579 (8th Cir. June 30,2015) and *Danny Fischer v. Minneapolis Public Schools*, Slip Op., No. 14-2245 (8th Cir. July 8, 2015). Timing can also be relevant to show a lack of causal connection between participation in the protected activity and the adverse employment action.

In an Order from this Court, dated July 9, 2015, the parties were instructed to further argue the chronology issue in light *Fischer* and *Rise*. In both cases, the Eighth Circuit indicated that timing can be circumstantial evidence of retaliatory conduct. *Fischer* and *Stewart* also appear to instruct that timing can be relevant to show the existence of or the lack of causal connection between participation in the protected activity and the adverse employment action. As noted above in the *Runyon* discussion, however, in both of these Eighth Circuit decisions timing was crucial due to it being the only causal connection the plaintiffs offered in their respective retaliation claims. Axness, however, has at least made out a colorable claim that Aqreva, Campbell, and Dr. Sanchez anticipated Axness would file a claim with the South Dakota Department of Labor. As argued in her brief, deposition testimony from Dr. Sanchez indicates that he intended to provide Axness with severance pay along with her remaining payroll. Subsequently, Dr. Sanchez changed course and decided Axness would be paid severance provided she sign the Release. (Sanchez Depo. at 91) ("No, I said, you know, we should probably help somehow, . . ., and then after that [Campbell] said, this is the way that things usually work, . . ., the word severance, . . ., check, so – and I play along . . ."); *Id.* at 93 (Sanchez indicating that the two-week severance pay was his idea; he "wanted to help"); *Id.* (Sanchez stating that he did not instruct his attorney to draft the severance paperwork, but that he "play[ed] along."); *Id.* at 95 (Sanchez stating that it was recommended he not simply provide severance pay to Axness, that a release form should be sent); *Id.* at 98 (Sanchez stating that he told Campbell he "just wanted to offer [Axness] two week of severance pay" with no conditions).

Offering further instruction on the issue of chronology is the Tenth Circuit case *Sauers v. Salt Lake County*, 1 F.3d 1122 (10th Cir. 1993). In *Sauers*, the plaintiff was a secretary at the Salt Lake County Attorney's Office in Utah. During her time there, the plaintiff alleged that she was subjected to sexual harassment by Ted Cannon, the county attorney and the plaintiff's highest level supervisor. The relevant incident involved Cannon allegedly "rub[ing] his groin against [the plaintiff's] shoulder." *Sauers*, 1 F.3d at 1126. At trial, evidence was introduced that the

plaintiff was reassigned to a separate branch of the office two days after the incident with Cannon. Evidence was further introduced suggesting that the reassignment was due to Cannon's anticipation of the plaintiff filing a complaint against him. *Id.* at 1128. Subsequently, the plaintiff brought charges including, *inter alia*, retaliation.

The trial court found that the plaintiff's claim did not "match the usual pattern present in retaliation cases" and dismissed the claim. *Id.* The Tenth Circuit, however, held the trial court to be clearly erroneous. A tape recorded conversation was introduced at trial supporting the proposition that Cannon reassigned the plaintiff out of fear of a sexual harassment claim. Notably, the recorded conversation occurred prior to the plaintiff's actual filing. In finding that such a sequence of events can support a claim of retaliation, the *Sauers* court held, "Action taken against an individual in anticipation of that person engaging in protected opposition to discrimination is no less retaliatory than action taken after the fact; consequently we hold that this form of preemptive retaliation falls within the scope of 42 U.S.C. § 2000e–3(a)." *Id. See U.S.E.E.O.C. v. Bojangles Restaurants, Inc.*, 284 F. Supp. 2d 320, 328 (M.D.N.C. 2003) ("An employer may not discriminate against an employee who it fears will later file a charge, testify, assist, or participate in an investigation or hearing."). *See also Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (interpretation of Title VII should not "provide a perverse incentive for employers to fire employees who might bring Title VII claims.").

The Court finds *Sauers* persuasive. Similar to *Sauers*, the record here supports Axness's assertion that Dr. Sanchez, at the suggestion of Campbell, changed course from giving severance pay outright to giving severance pay on condition that Axness sign the Release. As the cited deposition testimony above shows, Dr. Sanchez wanted simply to provide severance pay to Axness, but, instead, attached a condition. The Court finds that a reasonable jury could conclude that such action was in anticipation of Axness filing a charge against Dr. Sanchez and Aqreva. The Court notes Aqreva's reliance on *Herron v. DaimlerChrysler Corp*, 388 F.3d 293, 302 (7th 2004) ("It is axiomatic that a plaintiff engage in a statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity."), but finds *Sauers* more persuasive. Were the Court not to allow an "anticipatory retaliation" claim, it feels that an abusive loophole would be left open. *Sauers* is convincing on this point because were the court there to affirm the dismissal of the plaintiff's retaliation claim, the defendant would have,

27

in effect, successfully anticipated and unlawfully retaliated against an action it perceived the plaintiff could and would lawfully undertake. Thus, the Court finds that to dismiss Axness's retaliation claim would "provide a perverse incentive for employers to fire employees who might bring Title VII claims." *Robinson*, 519 U.S. at 346.

Finally, during a pretrial conference held on July 13, 2015, counsel for Aqreva provided the Court with three cases discussing the effect of "minor annoyances" on the viability of retaliation claims. *See Herron*, 388 F.3d at 301; *Mayers v. Campbell*, 87 Fed. Appx. 467, 471 (6th Cir. 2003); *Matthews v. Donahoe*, 493 Fed. Appx. 796, 800 (7th Cir. 2012). These cases hold that "minor annoyances" or "de minimis employment actions" are not actionable retaliation claims. Most akin to the case at bar, *Donahoe* instructs that a "mere two-month delay in [a plaintiff's] continuation of pay, though an annoyance, ha[s] no effect on the terms of her employment." *Donahoe*, 493 Fed. Appx. at 800. Aqreva's contention would be persuasive if payroll was all that was allegedly being withheld. Rather, here the withholding of 1.53 hours' worth of payroll is not the only adverse action charged against Defendants. As discussed, two-weeks of severance pay that Axness argues she was entitled to was conditionally withheld upon the signing of the Release. The withholding of two-weeks' worth of pay from an employee certainly rises above the "mere annoyance" threshold. Moreover, in each of the above cited cases, the plaintiffs were eventually given the withheld pay. Here, Axness has not been provided the severance pay she alleges she is owed. Whether she is owed that pay is a question to be presented to a jury. Defendants' motions for summary judgment as to Axness's Title VII and state law retaliation claims are denied.

# D. WHETHER AQREVA IS ENTILTED TO SUMMARY JUDGMENT AGAINST AXNESS ON HER S.D.C.L. § 20-13-11 CLAIM?

S.D.C.L. § 20-13-11 reads in full,

> It is an unfair or discriminatory practice for any *employment agency*, because of race, color, creed, religion, sex, ancestry, disability, or national origin, to accord adverse or unequal treatment to any person in connection with any application for employment, any referral, or any request for assistance in procurement of employees, or to accept any listing of employment on such a basis.

S.D.C.L. § 20-13-11 (emphasis added). Thus, the requirement exists that Aqreva operate as an "employment agency," which is defined as,

> any person regularly undertaking, with or without compensation, to procure employees for an employer or to procure for employees opportunities to work for an employer and includes any agent of such a person[.]

S.D.C.L. § 20-13-1. For the reasons stated in Part I.B.2., Axness has demonstrated that a reasonable jury could conclude that Aqreva operates as an "employment agency" and is, therefore, prohibited from discriminating in that capacity.

The meaning of SDCL § 20-13-11 has not been litigated, but comparatively, is 42 U.S.C. § 2000e2(b)'s state analogue. Unlike 42 U.S.C. § 2000e2(b), however, S.D.C.L. § 20-13-11 lacks language similar to 42 U.S.C. § 2000e2(b)'s proscription found in the "or otherwise to discriminate" clause. Instead, the South Dakota law confines itself to the discrete processes of employment referral. Pertinent to Axness, however, is the statute's "or any request for assistance in procurement of employees" clause. Based on a plain reading of that clause, an employment agency violates South Dakota law when it accords unequal treatment to a person's request for aid in securing employees for a business. Axness has adequately supported such an allegation. Axness claims that she requested Campbell secure for Axness temporary employment during Axness's leave. The record supports that, in response to the request, Axness was told locating temporary employment as requested was "cost prohibitive" and could not be granted. The record further supports that temporary employees were used prior and subsequent to Axness's request. Thus, sufficient evidence exists to maintain the S.D.C.L. § 20-13-11 claim. Ultimately, the reasoning stated in Part II.A., *supra*, applies.

Because of the absence of instructional case law, the Court will analyze the state claim under the *McDonnell Douglas* rubric: (1) Axness is within a protected class in that she was pregnant at the time of the request, (2) it is undisputed that she was qualified to perform her job, (3) the relevant adverse employment action rests with being denied her request to secure temporary employment, and (4) temporary replacements had been used before, most relevant being DV when she injured her ankle in 2010.

Thus, the burden of production shifts to Aqreva and Campbell to produce a nondiscriminatory reason for the denied request. To that end, Aqreva asserts that it denied Axness's request for two

29

principal reasons: (1) the use of temporary workers is "cost prohibitive" and (2) temporary workers are inadequate for the position.

Having adduced nondiscriminatory purposes, the burden shifts again back to Axness and she must show that the proffered nondiscriminatory explanations are pretextual. For her part, Axness emphasizes that temporary workers had been used in the past, both to cover her own previous absences and the absences of others. The record shows that a temporary worker has been used in Kelly's place since Axness's departure from CAN. Moreover, the relevant Axness request, as distinct from all other requests from Axness herself and others, was incidental to Axness seeking maternity leave. Accordingly, Axness has withstood the *McDonnell Douglas* analysis and Aqreva's motion for summary judgment is denied.

## E. WHETHER DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST AXNESS ON HER CLAIM FOR PUNITIVE DAMAGES?

Finally, Dr. Sanchez and CAN claim they are entitled to summary judgment on the issue of punitive damages both because Axness's theory of liability is deficient and because she has failed to establish the required intent on the part of Defendants. It is important to separate the Title VII punitive damage standards under 42 U.S.C. § 1981a(b)(1) and the standard that is applicable to Plaintiff's state law claims under SDCL 20-13-26.[7] Discussed, *supra*, under Title VII, Axness must show that a defendant has engaged in discriminatory conduct "with malice or with reckless indifference to [her] federally protected rights . . .")[8] Under South Dakota law, before a punitive damages claim can be submitted to the jury, SDCL § 21-1-4.1 requires the Court to determine whether there exists clear and convincing evidence providing "a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the party claimed against." *Id.* "Willful and wanton misconduct demonstrates an affirmative, reckless state of mind or deliberate recklessness on the part of the defendant." *Flockhart v. Wyant*, 467 N.W.2d 473, 478 (S.D. 1991). Malice can be either actual or presumed. *Kjerstad v. Ralellette Publications, Inc.*, 517 N.W.2d 419 (S.D. 1994). "Actual malice is a positive state of mind,

---

[7] Pursuant to SDCL 20-13-35.1, punitive damages may be awarded under SDCL 21-3-2 for a violation of SDCL 20-13-26.

[8] "'[M]alice' or 'reckless indifference' pertains to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.'" *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999).

30

evidenced by the positive desire and intention to injure another, actuated by hatred or ill-will towards that person." *Dahl v. Sittner*, 474 N.W.2d 897, 900 (S.D. 1991). Presumed malice implies that the "act complained of was conceived in the spirit of mischief or criminal indifference to civil obligations." *Id.* A claim for presumed malice requires a showing of disregard for the rights of others. *See Flockhart*, 467 N.W.2d at 475.

Accordingly, South Dakota's punitive damages standard is stricter than 42 U.S.C. § 1981a(b)(1). Sufficient evidence exists, however, that a jury could reasonably conclude amounts to recklessness on the part of CAN and Dr. Sanchez. Viewing the facts most favorable to Plaintiff, the record shows that Axness became pregnant and underwent an unscheduled C-section several weeks in advance of her due date. In the face of that knowledge, Dr. Sanchez terminated Axness's employment two-weeks into a four-week maternity leave. While, independently, those events may not rise to a level of recklessness, the record shows that DV, Axness's predecessor, was granted four-weeks of leave due to an ankle injury. Moreover, Dr. Sanchez's deposition contains admissions that he was "playing along" with recommendations from Campbell and Aqreva as to Axness's employment. Thus, circumstantially, a reasonable jury could conclude that Dr. Sanchez was reckless in his actions. Summary judgment as to South Dakota punitive damages, therefore, is denied. These are questions for the jury. Accordingly,

IT IS ORDERED (1) that Plaintiff's motion for partial summary judgment is denied; (2) that Defendant-Aqreva's and Defendant-Campbell's joint motion for summary judgment is denied; and (3) that Defendant-Child & Adolescent Neurology's and Defendant-Dr. Sanchez's joint motion for summary judgment is denied.

Dated this 27th day of July, 2015.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY:
DEPUTY

31